UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GLOBAL CHARTER SERVICES, INC., d/b/a THE BUSBANK, )<br><br>Plaintiff, )<br><br>v. )<br><br>MARK LAROCCA, RUDY ORTIZ, and )<br>9139249 CANADA INC. d/b/a BUS.COM, )<br><br>Defendants. ) | No. 22 C 1849<br><br>Judge Sara L. Ellis |

## OPINION AND ORDER

Plaintiff Global Charter Services, Inc. ("GCS"), an online charter bus booking platform, filed this eighteen-count lawsuit against two of its former employees, Mark LaRocca and Rudy Ortiz (the "Former Employee Defendants"), and their new employer, Bus.com. LaRocca left GCS on May 26, 2021 and immediately joined Bus.com, a competing charter bus booking platform. LaRocca then solicited Ortiz to join Bus.com, and on February 1, 2022, Ortiz left GCS and immediately joined Bus.com. GCS alleges that the Former Employee Defendants violated their employment agreements and misused proprietary information and trade secrets. GCS brings claims against all Defendants for misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b); tortious interference with GCS' business relationships; and civil conspiracy. GCS also alleges that the Former Employee Defendants breached their contracts and fiduciary duties. GCS additionally brings claims against LaRocca and Bus.com for tortious interference with contract and aiding and abetting breach of fiduciary duty. Finally, GCS brings a claim for unjust enrichment against Bus.com. The Former Employee Defendants and Bus.com separately moved to dismiss GCS' amended complaint

pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]  Because GCS has not sufficiently alleged its DTSA claim, GCS has not pleaded a sufficient basis for this Court's subject matter jurisdiction.  The Court therefore dismisses GCS' amended complaint without prejudice.

## BACKGROUND[2]

### I.  The Former Employee Defendants and GCS

LaRocca worked as an Event Manager at GCS from August 2014 until May 26, 2021, when he left to join GCS' competitor, Bus.com.  After leaving GCS, LaRocca solicited Ortiz, then a GCS Sales Associate and Senior Account Executive, and another GCS employee, to follow suit and join him at Bus.com.  In December 2021, LaRocca forwarded Ortiz a sample Bus.com consulting agreement, and in February 2022, Ortiz resigned from GCS and joined Bus.com.

During their time working for GCS, the Former Employee Defendants accessed highly confidential information and trade secrets, including client information, GCS systems and strategy, and GCS Marketplace, an "electronic compilation of information relating to reliable bus operators in the transportation industry across the United States."  Doc. 26 ¶ 14.  GCS spent "thousands of hours over the course of two decades travelling for in-person and telephonically conducted interviews with bus operators to compile relevant information to formulate the GCS Marketplace."  *Id.* ¶ 15.  The GCS Marketplace uses "highly valuable sophisticated proprietary software" to "track ongoing performance of bus operators, conduct unique scoring exercises

---

[1] In their reply briefs, Defendants argue that GCS' briefs exceed the page limit provided by the Court and asks the Court to disregard any arguments made after the first twenty pages of GCS' responses.  GCS has filed a sur-reply explaining its interpretation of the Court's previous orders.  Because it may have been unclear how many pages were allowed, the Court finds it more appropriate to resolve the issues on their merits and not on mere technicalities.  As such, the Court had considered the entirety of the briefing.
[2] The Court takes the facts in the background section from GCS' amended complaint and exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motions to dismiss.  *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

relating to bus operators, prepare and maintain performance records of bus trips, perform government record checks, store and monitor bus operator insurance information, maintain contacts and fleet information, and store pricing information." *Id.* ¶¶ 16, 18. Additionally, LaRocca and Ortiz attended meetings where people discussed GCS' future strategy, including plans to update its proprietary platform.

GCS has taken significant steps to protect its confidential information and trade secrets, including "restricting access to the GCS Marketplace through the use of encrypted usernames and passwords, storing information only on GCS's platform where only certain employees are granted access, requiring a single sign-on process tied to GCS's corporate Google profiles," and requiring its employees to sign employment agreements with non-compete, confidentiality, non-disclosure, non-solicitation, and non-disparagement clauses. *Id.* ¶ 21. Both Former Employee Defendants signed employment agreements containing such clauses.

The non-competition clause states "[d]uring my employment with GCS, and during [the twelve-month period following the end of my employment with GCS], I agree not to, directly or indirectly, engage in any Competitive Activity." Doc. 26-1 at 2; Doc. 26-2 at 2. "Competitive Activity" includes:

> becom[ing] an employee of a Competitive Enterprise in a capacity that is similar to the capacity I was in, or provide services that are similar to the services I provided, or with responsibilities that are similar to the responsibilities I had, in each case, when I was employed by GCS.

Doc. 26-1 at 2; Doc. 26-2 at 2. The agreements define a "Competitive Enterprise" as:

> any business that (i) engages in any charter bus booking service identical or similar to any service engaged in by GCS, or (ii) owns or controls a significant interest in any entity that engages in any charter bus booking service identical or similar to any service engaged in by GCS.

Doc. 26-1 at 3; Doc. 26-2 at 3.

3

The agreements also included confidentiality and non-disclosure clauses:

> 9. <u>Confidentiality.</u>  I recognize and acknowledge that the systems and strategy which GCS owns, plans or develops, whether for its own use or for use by its clients, are confidential and are the property of GCS.  I further recognize and acknowledge that in order to enable GCS to perform services for its motor carriers and charter clients, such motor carriers and charter clients may furnish to GCS confidential information concerning their business affairs, property, methods of operation or other data; that the goodwill afforded to GCS depends upon, among other things, GCS and its employees keeping such services and information confidential (collectively, including GCS systems and strategy and GCS client information, the "Confidential Information").
>
> 10. <u>Non-Disclosure.</u>  I agree that, except as directed by GCS, I will not at any time, whether during or after my employment with GCS, disclose to any person or use any Confidential Information, or permit any person to examine and/or make copies of any documents which contain or are derived from Confidential Information, whether prepared by me or otherwise coming into my possession or control without the prior written permission of GCS.

Doc. 26-1 at 5–6; Doc. 26-2 at 5–6.

The agreements also contain non-solicitation clauses:

> 4. <u>Non-Solicitation of GCS Motor Carriers and Charter Clients; Non-Interference</u>.
>
> > (a) During my employment with GCS, and during the 24 month period following the end of my employment, I agree not to, directly or indirectly, in any capacity, contact and/or solicit any GCS motor carrier or charter client (other than in my capacity as an employee of GCS) for purposes of coordinating charter bus booking services that utilize any strategies that are identical or similar to any coordination of charter bus booking services or strategies utilized by GCS.
> >
> > (b) During my employment with GCS, and during the 24 month period following the end of my employment, I agree not to, directly or indirectly, in any capacity, accept payment for travel services from any GCS charter client (other than in my capacity as an employee of GCS).
> >
> > (c) During my employment with GCS, and during the 24 month period following the end of my employment, I agree

not to, directly or indirectly, in any capacity, interfere, or attempt to interfere, with the relationship between any GCS motor carrier or charter client and GCS.

(d) "Motor carrier" means any person or entity that actually provided transportation services for GCS during the 12 month period preceding the end of my employment (i) that I knew was a motor carrier that provided transportation services to GCS, or (ii) with whom I had contact as an employee. Motor carrier also means any person or entity that was an advisor, consultant, or manager of any person or entity referred to in clauses (i) or (ii) of the preceding sentence.

(e) "Charter client" means any person or entity that utilizes the services of GCS in connection with its charter bus booking service during the 12 month period preceding the end of my employment (i) that I knew was a charter client of GCS, or (ii) with whom I had contact as an employee. Charter client also means any person or entity that was an advisor, consultant, or manager of any person or entity referred to in clauses (i) or (ii) of the preceding sentence.

5. <u>Non-Solicitation of GCS Employees</u>.

(a) During the 24 month period following the end of my employment, I agree not to, directly or indirectly, in any capacity, employ any GCS Employee.

(b) During any employment with GCS, and during the 24 month period following the end of my employment, I agree not to, directly or indirectly, in any capacity, solicit any GCS Employee to cease employment with GCS.

(c) During my employment with GCS, and during the 24 month period following the end of my employment, I agree not to, directly or indirectly, in any capacity, induce any GCS Employee to cease employment with GCS.

(d) "GCS Employee" means any person that (i) is an employee of GCS at the time of my contact, solicitation or inducement, or (ii) was an employee of GCS at any time within the 30 day period immediately preceding such contact, solicitation or inducement.

Doc. 26-1 at 4–5; Doc. 26-2 at 4–5.

Further, the employment agreements required the Former Employee Defendants to "not make any oral or written statement to any third party that disparages, defames, or reflects adversely upon GCS, or any of its principals, officers, employees or services." Doc. 26-1 at 5; Doc. 26-2 at 5. Notwithstanding this clause, while LaRocca was still employed by GCS, he made false and disparaging statements about the financial health of GCS to one of its clients, Latitude 38. Finally, the agreements require the Former Employee Defendants to notify any future employers of their obligations under the agreements for the twenty-four month period following the end of their employment with GCS.

## II. The Former Employee Defendants and Bus.com

The Former Employee Defendants took GCS' confidential information with them to Bus.com. For example, on January 7, 2021, LaRocca sent an email to his personal email address that contained a screenshot of a list of bus operators and their contact information, and on May 7, 2021, he forwarded two email chains to his personal email address that contained details of two recent bookings he had handled. LaRocca also sent himself emails with confidential information to his corporate GCS email address. Ortiz also forwarded emails with confidential information to his personal email address. For example, on January 14, 2022 and January 31, 2022, he sent himself a total of three emails containing details about bookings for GCS' client, the Ultimate Fighting Championship ("UFC"). Additionally, Ortiz failed to return two laptops owned by GCS containing highly confidential information and trade secrets.[3]

---

[3] Defendants contend that these laptops were returned to GCS prior to the filing of the amended complaint. But at the motion to dismiss stage, the Court considers only the well-pleaded facts in GCS' amended complaint and draws all reasonable inferences from those facts in GCS' favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016); *Columbus v. Travelers Ins. Co.*, 725 F. Supp. 396, 398 (N.D. Ill. 1989) ("The court cannot rely on defendant's assertions of fact which go beyond the scope of the pleadings in deciding this motion.").

The Former Employee Defendants used this confidential information to engage in employment negotiations with Bus.com and, once employed with Bus.com, used this information to solicit GCS' customers. For instance, while at GCS, LaRocca was part of a team trying to secure a contract with the Inkcarceration Festival. But the Inkcarceration Festival ultimately booked with Bus.com. Similarly, while at GCS, Ortiz worked with the UFC, and after he left GCS, the UFC booked its events through Bus.com.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak*, 810 F.3d at 480–81. To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

In its amended complaint, GCS brings only one federal claim, for violation of the DTSA, as well as a number of state law claims. Because GCS and LaRocca are both Illinois citizens, GCS cannot rely on diversity jurisdiction as the basis for subject matter jurisdiction, instead premising the Court's jurisdiction on the federal DTSA claim and asking the Court to exercise supplemental jurisdiction over the state law claims. *See Exxon Mobil Corp. v. Allapattah Servs.,*

*Inc.*, 545 U.S. 546, 553 (2005) ("In a case with multiple plaintiffs and multiple defendants, the presence in the action of a single plaintiff from the same State as a single defendant deprives the district court of original diversity jurisdiction over the entire action."). Therefore, before addressing any other arguments for dismissal, the Court considers whether GCS has adequately alleged a DTSA claim.

**I.    DTSA Claim (Count XVII)**

The DTSA, 18 U.S.C. § 1836, creates a private cause of action for "an owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To state a DTSA violation, GCS must allege that "(1) there are trade secrets (2) that Defendants misappropriated." *Aon plc v. Infinite Equity, Inc.*, No. 19-cv-07504, 2021 WL 4034068, at *12 (N.D. Ill. Sept. 3, 2021).

**A.    Existence of a Trade Secret**

Defendants argue that GCS has not adequately alleged the existence of a trade secret. The DTSA defines a trade secret as business-related information that the owner of which has taken reasonable measures to keep secret and from which the owner derives economic value from the information not being generally known or readily ascertainable by others who could gain an economic advantage from the information. 18 U.S.C. § 1839(3).

For a DTSA claim to survive a motion to dismiss, a complaint need only identify the alleged trade secret in a general sense. *See, e.g.*, *Wells Lamont Indus. Grp. LLC v. Richard Mendoza & Radians, Inc.*, No. 17 C 1136, 2017 WL 3235682, at *3 (N.D. Ill. July 31, 2017) (allegation that the defendant "was exposed to confidential information such as customer account information, product summaries, pricing sheets, product prototypes, product designs, and

8

detailed sales reports" sufficed at the pleading stage). "Where an employer has invested substantial time, money, and effort to obtain a secret advantage, the secret should be protected from an employee who obtains it through improper means." *Von Holdt v. A-1 Tool Corp.*, No. 04 C 04123, 2013 WL 53986, at *11 (N.D. Ill. Jan. 3, 2013). Ultimately, a plaintiff "must prove that the real value of the information lies in the fact that it is not generally known to others who could benefit from using it." *Id.*

GCS alleges that its trade secrets include the GCS Marketplace, GCS systems and strategy, and GCS customer information. Defendants argue that this description is too broad to allege the existence of a trade secret and "encompass[es] virtually any business information that Defendants could have come into contact with while at GCS." Doc. 33 at 13. But the amended complaint describes the GCS Marketplace as "an electronic compilation of information relating to reliable bus operators in the transportation industry across the United States," which includes details of the "carrier's fleet, pricing information, insurance, customer ratings, and GCS's own internal ratings system which GCS created based off a variety of factors relating to bus operator performance for trips run by GCS." Doc. 26 ¶¶ 14, 17. GCS also alleges that it invested substantial time, money, and effort to aggregate this information and that it gives GCS a competitive edge. GCS Marketplace appears to be a sort of customer database containing confidential information about GCS' clients that it has accumulated over time. Even basic customer lists "can warrant protection as trade secrets" as long as the list is "sufficiently secret" and took "considerable effort, time, and resources" to build. *Fleetwood Packaging v. Hein*, No. 14 C 09670, 2015 WL 6164957, at *3 (N.D. Ill. Oct. 20, 2015). But customer information does not warrant protection if it is "generally available to employees, known by persons in the trade, or easily found in telephone directories and industry directories." *Chicagoland Aviation, LLC v.*

9

*Todd*, No. 12cv1139, 2012 WL 5948960, at *5 (N.D. Ill. June 8, 2012). Here, GCS alleges that the GCS Marketplace includes detailed information about its customers, including information not known to the public or others in the industry. This suffices at this stage to allege the existence of a trade secret. *See Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *9 n.2 (N.D. Ill. Sept. 8, 2017) ("Although the DTSA does not expressly include customer lists within its definition of a trade secret, its definition includes any valuable business information for which reasonable measures are taken to maintain secrecy, and is therefore applicable to customer lists.").

### B. Misappropriation

Defendants also argue that GCS has not adequately alleged misappropriation. Misappropriation under the DTSA includes the "acquisition of a trade secret of another . . . by improper means" and "disclosure or use of a trade secret of another without express or implied consent" under certain conditions. 18 U.S.C. § 1839(5). In other words, misappropriation occurs by (1) improper acquisition, (2) unauthorized disclosure, or (3) unauthorized use. *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 819 (N.D. Ill. 2014). GCS alleges that Defendants misappropriated its trade secrets through all three.

Improper means requires alleging "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6). GCS argues that because the employment agreements prohibited the Former Employee Defendants from disclosing confidential information, they acquired the trade secrets through improper means. But the amended complaint makes clear that the Former Employee Defendants acquired the trade secrets through the normal course of their employment. *See* Doc. 26 ¶ 41 ("Through his employment with GCS, LaRocca was given access to, and in fact

accessed, highly confidential information and trade secrets, including but not limited to the GCS Marketplace, GCS systems and strategy, and GCS client information."); *id.* ¶ 42 ("Through his participation in these meetings, LaRocca was privy to confidential and proprietary information relative to the structure and strategy for the updated proprietary platform to be built by GCS."); *id.* ¶ 47 (noting that as a "key employee" LaRocca was "exposed to GCS' most sensitive proprietary information and trade secrets, including the GCS Marketplace."); *id.* ¶ 80 ("Through his employment with GCS, Ortiz was given access to, and in fact accessed, highly confidential information and trade secrets, including but not limited to the GCS Marketplace, GCS systems and strategy, and GCS client information."). That the Former Employee Defendants continued to possess the trade secret information and that they may have breached their employment agreements does not establish misappropriation through improper means. *See Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1066 (N.D. Ill. 2020) (finding that trade secrets are not improperly acquired when employee that is given access through the normal course of their employment retains access to the trade secrets); *Prominence Advisors, Inc. v. Dalton*, No. 17 C 4369, 2017 WL 6988661, at *5 (N.D. Ill. Dec. 18, 2017) (same). GCS also argues that Bus.com improperly acquired GCS' trade secrets because it induced the Former Employee Defendants to breach their employment agreements. But the amended complaint contains no factual allegations supporting the assertion that Bus.com induced the Former Employee Defendants to breach their employment agreements. Thus, GCS has not adequately alleged improper acquisition.

GCS also alleges that Defendants misappropriated its trade secrets through unauthorized disclosure and use, which "requires a defendant to use the alleged trade secret or disclose them to others 'for purposes other than serving the interests of' the owner of the trade secrets." *Traffic Tech, Inc. v. Kreiter*, No. 14-cv-7528, 2015 WL 9259544, at *12 (N.D. Ill. Dec. 18, 2015)

(quoting *Instant Tech, LLC v. DeFazio*, 40 F. Supp. 3d 989, 1015–16 (N.D. Ill. 2014)). Defendants argue that GCS has failed to adequately allege that Defendants disclosed or used GCS' trade secrets for the benefit of Bus.com. GCS contends that its amended complaint provides direct evidence of misappropriation through the emails the Former Employee Defendants forwarded to themselves as well as Ortiz retaining two GCS laptops, and that even if this does not amount to direct evidence, GCS has provided strong circumstantial evidence that Defendants misappropriated its trade secrets.

      Here, GCS has attached to its amended complaint emails that the Former Employee Defendants sent to themselves at both their work and personal email address. The emails include confidential information about GCS' clients, such as a screenshot from the GCS Marketplace. GCS also alleges that Ortiz kept two GCS laptops, which contained confidential and proprietary information. But "mere possession of trade secrets does not suffice to plausibly allege disclosure or use of those trade secrets, even when considered in conjunction with solicitations of former clients." *Croner*, 419 F. Supp. 3d at 1066; *see also Indus. Packaging Supplies v. Channell*, No. 18 C 165, 2018 WL 2560993, at *2 (N.D. Ill. June 4, 2018) ("Industrial Packaging has alleged that Channell and other Axis employees used to work at Industrial Packaging, where they had access to its trade secrets and that Axis offers the same services and targets the same clients as Industrial Packaging. But this is not enough to justify its otherwise unsupported suspicions that the defendants used or disclosed the information they had access to while working for Industrial Packaging."). Nor do GCS' claims that some of its former clients moved their business to Bus.com further its claim that Defendants have misappropriated GCS' trade secrets. *See Croner*, 419 F. Supp. 3d at 1069 ("[L]ost business alone is not enough to support a claim of trade secret

misappropriation, and PCA must adequately allege that Croner has done more than legally compete in the normal course of business.").

GCS argues that it has provided adequate circumstantial evidence to support its claim, citing *In re Adegoke*, 632 B.R. 154 (Bankr. N.D. Ill. 2021) and other cases. But the circumstantial evidence here is much weaker than in those cases. *See Inmar v. Vargas*, No. 18-cv-2306, 2018 WL 6716701, at *2 (N.D. Ill. Dec. 21, 2018) (employee forwarded confidential information to private email *after* accepting an offer at competitor); *Mickey's Linen*, 2017 WL 3970593, at *12 (employee wiped all data from his company-issued phone before returning it, making it impossible for employer to determine if the data was sent to anyone else, failed to return company documents, and the court found his explanations incredible); *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 282 (2005) (employee downloaded confidential information mere hours prior to resigning and *after* agreeing to work for a competitor). For instance, in *Adegoke*, the case principally relied on by GCS, the debtor downloaded 397 confidential files the day after he interviewed with a competitor. *Id.* at 168. Then, five days later, and the day before his next interview with the competitor, the debtor downloaded all files related to his current employer's new business, with which the debtor was not involved. *Id.* And again before his third interview, the debtor downloaded additional files containing confidential information such as "highly confidential sales pipeline, rate cards, proprietary pricing tools, and operational template documents," despite the fact that "[d]ebtor was not working for the client related to these files, and had no need for the sales files." *Id.* Here, the Former Employee Defendants forwarded themselves emails, which GCS contends contain trade secrets and highly confidential and proprietary information but which nonetheless GCS has filed publicly on the docket. If GCS was so concerned about the disclosure of the information in those emails the Court would have

13

expected them to be filed under seal initially, or at least upon Defendants pointing out that GCS has made them publicly available. And unlike *Adegoke*, here the majority of these emails were sent months prior to the Former Employee Defendants departures, with many of the LaRocca emails sent more than four months prior to his resignation, with one sent over sixteen months prior to his resignation, and GCS does not explain or allege that LaRocca was considering moving to Bus.com that far in advance of his resignation. Further, LaRocca forwarded the majority of his emails to his corporate GCS email, not a personal email address, and at least some appear to have been forwarded for normal business purposes, such as LaRocca sending his notes to himself. *See, e.g.*, Doc. 26-5 at 13 (email forwarded approximately one month prior to resignation stating "I have a call set up for BottleRock 2021. It is my assumption, based on no updates or lineup announcements, it will be to formally cancel the 2021 event prior to a public announcement so I can call off staff/hotels/etc. before anything is owed. . . . If the call is to cancel I need to tell them all refunds are final."); *see also* Doc. 26-5 at 2 (email titled "inkaration" sent approximately sixteen months prior to resignation containing notes about a booking for the Inkcarceration Festival). The majority of the other emails contain logistical details about upcoming bookings handled by GCS, such as a pickup schedule, *see* Doc. 26-14 at 11–13, and vehicle preferences, *see id.* at 6–10. Unlike *Adegoke*, the circumstantial evidence here does not support an inference of misappropriation. Because GCS has not adequately alleged that Defendants misappropriated its trade secrets, the Court dismisses its DTSA claim without prejudice.

## II.     Supplemental State Law Claims

GCS also brings numerous state law claims against Defendants, which it contends the Court has supplemental jurisdiction over pursuant to 28 U.S.C. § 1367. But because the Court

14

dismisses the DTSA claim over which it has original jurisdiction, the Court declines to exercise supplemental jurisdiction over GCS' state law claims. *See* 28 U.S.C. § 1367(c); *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial."). The Court therefore dismisses the state law claims against Defendants without prejudice and defers consideration of Defendants' arguments for dismissal of these claims until GCS adequately alleges a basis for the Court's subject matter jurisdiction.[4]

## CONCLUSION

For the foregoing reasons, the Court grants in part Defendants' motions to dismiss [32, 43]. The Court dismisses the amended complaint without prejudice and defers consideration of the state law claims until GCS pleads a sufficient basis for subject matter jurisdiction. Because the dismissal is without prejudice, the Court grants GCS until May 26, 2023 to file a second amended complaint. Further, in light of the filing of Bus.com's amended motion to dismiss [43] the Court denies as moot Bus.com's initial motion to dismiss [30].

Dated: April 26, 2023

SARA L. ELLIS
United States District Judge

---

[4] Although the Court dismisses GCS' DTSA claim without prejudice, allowing GCS leave to file an amended complaint, the Court encourages GCS to carefully consider the arguments Defendants made for dismissal of the state law claims and address any potential pleading deficiencies related to the state law claims in an amended complaint.